The PEOPLE of the State of Colorado: In re the Interest of: J.R.T., Minor Child, Petitioner,

v.

Jason MARTINEZ, Respondent.

The People of the State of Colorado: In re the Interest of: J.A., Minor Child, Petitioner,

v.

Jason Martinez, Respondent.

Nos. 02SC316, 02SC317.

Supreme Court of Colorado, En Banc.

June 2, 2003.

Pueblo County Attorney's Office, Pat J. Rosales–Chavez, Assistant County Attorney, Pueblo, Colorado, Attorneys for Petitioner.

Margaret L. Herdeck, Pueblo, Colorado, Attorney for Respondent.

Justice HOBBS delivered the Opinion of the Court.

This opinion consolidates two cases in which the trial courts modified the amount of child support that Jason Martinez was required to pay for two of his children, J.A. and J.R.T.[1] In both cases, the trial courts held that Martinez was voluntarily underemployed after he had been terminated from two jobs in Denver for knowingly violating company policy and had subsequently taken a lower paying position in Pueblo. The trial courts imputed income to Martinez based on the first—and highest paying—job from which he was fired.

Holding that Martinez was not "voluntarily underemployed" simply because he had been fired, the court of appeals reversed both trial courts. The court of appeals concluded that the trial courts should have examined "the reasonableness of father's attempts, if any, to obtain comparable employment and pay following his firings." *In re J.R.T.*, 55 P.3d 217, 220 (Colo.App.2002). The unpublished second case, *In re J.A.*, 2002 WL 1822995, relied heavily on the published case.

We agree with the court of appeals. The income imputation inquiry must start with whether the parent is shirking a child support obligation. Is the parent unreasonably foregoing higher paying employment that he or she could obtain? If not, the child support obligation calculation commences with actual gross income. If the parent is shirking a child support obligation, the trial court must determine what the parent can reasonably earn and contribute to the child's support. In determining whether to impute income to a parent when considering a child support modification order, the trial court must examine all relevant factors.

## I.

In April 1995, the trial courts first set child support in the amount of $308 per child per month for J.A. and J.R.T. At that time, Martinez was employed in Denver by Denver Mattress Company, earning $1866 per month. In 1998, Martinez was promoted to store manager, and his salary increased to $4510 per month and the child support order for J.A. was ultimately modified accordingly. Shortly afterwards, Martinez was fired for violating company sexual harassment policy by trying to resolve a dispute between two subordinates without reporting the alleged harassment to the legal department and by engaging in inappropriate conversations.

Next, Martinez accepted a position as an assistant store manager with A World of Tile in Denver, where he earned $2648 per month. Martinez was asked to resign when he failed to make timely bank deposits of company funds, after having been warned against such behavior. In both cases, Martinez signed letters following his termination or resignation in which he admitted wrongdoing and acknowledged awareness of the company policy he had violated.

In October 1999, after being fired a second time, Martinez looked for a job in Denver for a week or two, but he needed money immediately to pay rent for himself, his current wife, and one child. Martinez decided to move to Pueblo, where J.A. and J.R.T. reside, to live with his wife's family. Martinez obtained a retail job in Pueblo, earning approximately $2167 per month.

In November 1998, the trial court entered a default order increasing child support due for J.A. based on a monthly income of $4510. Then, Martinez moved to modify child support to decrease the amount owed. The trial court found that Martinez was voluntarily underemployed under section 14–10–115(7)(b)(I), 5 C.R.S. (2002), so it set child support based on an imputed monthly income of $4500, based on his income before being

1. We granted certiorari on two issues:
    1. Does "voluntarily underemployed" within the meaning of Section 14–10–115(7)(b)(I), C.R.S., hinge on whether a parent intentionally chooses to get fired from a job in an effort to reduce his or her income for child support obligation, or does it hinge on the reduction of available income for child support as a foreseeable consequence of a parent's misconduct?
    2. Is a parent underemployed voluntarily if after he is fired for cause from more than one job, he relocates immediately to another city where he is paid much less than at the positions from which he was fired?

fired from Denver Mattress Company.[2]

In August 2001, another trial court modified support owed for J.R.T. on motion of the Pueblo County Department of Social Services. That court also found that Martinez was voluntarily underemployed and had the potential to earn $4510 per month.[3]

Martinez separately appealed both child support modification orders. The court of appeals reversed both orders in decisions entered the same day, *In re J.R.T.,* 55 P.3d 217, and *In re J.A.,* unpublished. On the same day, a different division of the court of appeals decided *In re Marriage of Atencio,* 47 P.3d 718, 721 (Colo.App.2002), holding that a father who was fired for drug use was not voluntarily underemployed solely because he was fired. No party filed a certiorari petition in *Atencio.*

In *J.R.T.* the court of appeals reviewed the trial court's legal standard de novo and held that the trial court incorrectly concluded that Martinez was voluntarily underemployed based solely on the fact that he was fired for misconduct. *J.R.T.,* 55 P.3d at 219–20. Examining dictionary definitions and criminal law cases dealing with voluntary waiver of rights, the court of appeals determined that "voluntarily" has a commonly understood meaning as an intentional, free choice. *Id.* at 219. Since voluntarily modifies "unemployed or underemployed" the court concluded that "[t]he plain, definite, and sensible meaning of the provision, then, is that a parent is 'voluntarily unemployed or underemployed' when the parent intentionally chooses of his or her own free will to become unemployed or underemployed." *Id.* When considering whether or not to impute income under section 14–10–115(7)(b)(I), 5 C.R.S. (2002), the court of

appeals required the trial courts to inquire into the parent's behavior after being terminated from prior employment. 55 P.3d at 220. If the parent does not seek in good faith a job paying a comparable salary, or rejects employment offers, the parent could be voluntarily underemployed or unemployed for the purpose of imputing income. *Id.*

We granted the People's petition for certiorari, consolidated the two cases, and now affirm the judgments of the court of appeals.

## II.

We hold that the trial courts must examine all relevant factors bearing on whether the parent is shirking his or her child support obligation by unreasonably foregoing higher paying employment that he or she could obtain, and, if the parent is, the trial courts must determine what he or she can reasonably earn and contribute to the child's support. If the trial courts do not find that the parent is shirking his or her child support obligation by unreasonably foregoing higher paying employment, they should calculate the amount of child support starting from actual gross income only.

### A.

#### Standard of Review

■ We defer to the trial courts' findings of fact and review their legal conclusions de novo. *Jagow v. E–470 Pub. Highway Auth.,* 49 P.3d 1151, 1158 (Colo.2002). Deciding whether a parent is "voluntarily unemployed or underemployed" under section 14–10–115(7)(b)(I), 5 C.R.S. (2002), requires the trial

---

**2.** The trial court's order recites:

6. The father in this case will be deemed to be underemployed and has the potential of making income in the amount of $4500.00 per month. The sole reason for his termination from Big Sur [Denver Mattress Company] was his own failure to abide by the procedures set out by his employer. There is no evidence that this termination was done by the employer in bad faith ... The Respondent relocated to Pueblo because he could not find any equivalent paying jobs. The inference the Court will make is that the circumstances resulting in his termination from the last two employers has affected his ability to secure employment and

thus he is underemployed since that is a result of his own actions.

**3.** The trial court's order recites:

5. The Father was previously employed at Big Sur Waterbeds [Denver Mattress Company] with a gross income of $4510.00 per month; 6. The Father was also employed at A World of Tile with a gross monthly income of $2648.09; 7. The Father was terminated from both prior jobs because of his own misconduct; 8. The Father is voluntarily underemployed as defined by [section] 14–10–115(7)(b)(I). He has potential income of $4510.00 per month.

court to make factual findings and apply a legal standard to those findings. *See Atencio*, 47 P.3d at 720.

■■■ The meaning of a statutory term is a question of law for de novo review. *Office of Consumer Counsel v. Pub. Utils. Comm'n*, 42 P.3d 23, 27 (Colo.2002). When construing a statute, we seek to effectuate the legislative intent of the General Assembly. *Leonard v. McMorris*, 63 P.3d 323, 326 (Colo.2003). We examine the statutory language, giving words and phrases their commonly accepted and understood meaning. *Colo. Dep't of Revenue v. Garner*, 66 P.3d 106, 109 (Colo.2003). We read the statute as a whole and give harmonious and sensible effect to all its parts, when possible. *Martin v. People*, 27 P.3d 846, 851 (Colo.2001). In the event the statute is ambiguous, we consider the language the legislature chose to utilize, the evident legislative purposes, the consequences of alternative constructions, and the legislative history, if available. *Leonard*, 63 P.3d at 326.

### B.

### "Voluntarily Unemployed or Underemployed"

The phrase we construe in this opinion appears in Colorado's Uniform Dissolution of Marriage Act. Under that Act, both parents have a duty to support their children. In any action to establish or modify child support, the child support guidelines create a rebuttable presumption as to the appropriate amount of the child support order based upon each parent's actual gross income, sections 14–10–115(3)(a) and (7)(a), 5 C.R.S. (2002). The court may order either or both parents owing a duty of support to pay an amount reasonable or necessary for the child's support, after considering all relevant factors. § 14–10–115(1), 5 C.R.S. (2002).

Under section 14–10–115(7)(a), 5 C.R.S. (2002), income is defined as "actual gross income of a parent, if employed to full capacity, or potential income, if unemployed or underemployed." Section 14–10–115 proceeds to provide that the trial court shall impute potential income if the parent is "voluntarily unemployed or underemployed":

If a parent is voluntarily unemployed or underemployed, child support shall be calculated based on a determination of potential income; except that a determination of potential income shall not be made for a parent who is physically or mentally incapacitated or is caring for a child under the age of thirty months for whom the parents owe a joint legal responsibility.

§ 14–10–115(7)(b)(I), 5 C.R.S. (2002). The guidelines identify three circumstances in which a parent "shall not be deemed 'underemployed' ": temporary employment reasonably intended to result in higher income; a good faith career choice; and enrollment in an educational program:

(A) The employment is temporary and is reasonably intended to result in higher income within the foreseeable future; or

(B) The employment is a good faith career choice which is not intended to deprive a child of support and does not unreasonably reduce the support available to a child; or

(C) The parent is enrolled in an educational program which is reasonably intended to result in a degree or certification within a reasonable period of time and which will result in a higher income, so long as the educational program is a good faith career choice which is not intended to deprive the child of support and which does not unreasonably reduce the support available to a child.

§ 14–10–115(7)(b)(III)(A)–(C), 5 C.R.S. (2002). All three of these circumstances require a good faith, or reasonable, intent not to deprive the child of support. The second and third circumstances add that the parent's choice shall not unreasonably reduce the support available to the child. If any of these three circumstances exist, a trial court may not impute potential income to the parent.

The legislature's listing of these three income imputation exemption circumstances nevertheless leaves open the question of when the trial court can or must impute income to a parent. Because the statute directs the trial court to calculate child support based upon potential—rather than actual—income only if the parent is voluntarily unemployed or underemployed, we begin by examining the meaning of the term "volun-

tarily." The dictionary meaning of "voluntarily" is: "Intentionally; without coercion," Black's Law Dictionary 1569 (7th ed.1999), and as "of one's own free will," Webster's New International Dictionary 2564 (1993).

Accordingly, we conclude that the term "voluntarily" has the meaning "intentionally, of free will." Nevertheless, the statutory phrase "voluntarily unemployed or underemployed" is susceptible to alternative constructions: (1) the one adopted by the court of appeals that a parent is voluntarily unemployed or underemployed if, after being fired, he or she does not attempt in good faith to obtain new employment at a comparable salary or refuses to accept suitable employment offers; or (2) the other urged by the People that a parent is voluntarily unemployed or underemployed if the parent has been fired for misconduct from a higher paying job. The trial courts focused on the parent's fault in getting fired. The court of appeals focused on the parent's subsequent course of action and decision making. "The trial court[s] should have considered the reasonableness of father's attempts, if any, to obtain comparable employment and pay following his firings." *J.R.T.*, 55 P.3d at 220.

Courts in other jurisdictions differ from one another over the construction of statutory terms similar to ours. *See, e.g., Savage v. Savage,* 821 So.2d 603, 606–07 (La.App.2002) (being voluntarily unemployed results from an intentional act of misconduct which leads to unemployment); *Lee v. Lee,* 459 N.W.2d 365, 370 (Minn.App.1990) (stating that parent is voluntarily unemployed only if the parent intends to get fired in order to avoid paying child support); *Wilson v. Wilson,* 43 S.W.3d 495, 497 (Tenn.App.2000) (holding that voluntary unemployment or underemployment results from "an intent on the part of the parent to reduce or terminate his or her income"). Because Colorado's statutory language is susceptible to alternative constructions, we look to the statute as a whole and to the legislative history in determining the General Assembly's intent.

## C.

### Statutory Goals

In keeping with our primary responsibility to give effect to the General Assembly's in-

tent, *People v. Norton,* 63 P.3d 339, 343 (Colo.2003), we begin our analysis by examining the statutory goals of the child support guidelines. Their stated purposes are: to establish adequate child support based on parental ability to pay; to make awards more equitable; and to promote settlements:

(I) To establish as state policy an adequate standard of support for children, subject to the ability of parents to pay;

(II) To make awards more equitable by ensuring more consistent treatment of persons in similar circumstances;

(III) To improve the efficiency of the court process by promoting settlements and giving courts and the parties guidance in establishing levels of awards.

§ 14–10–115(3)(c)(I–III), 5 C.R.S. (2002) (emphasis added). A child support order should serve these three statutory purposes and the best interests of the child. *In re Marriage of Aldrich,* 945 P.2d 1370, 1375 (Colo.1997); *Abrams v. Connolly,* 781 P.2d 651, 656 (Colo. 1989).

Section 14–10–115(1), 5 C.R.S. (2002), requires the court to consider all relevant factors in determining the amount of child support that is reasonable under the circumstances. Considering all relevant factors implements the Act's underlying legislative policy to mitigate the potential hardship to children caused by the dissolution of marriage and assure their ongoing support. *Aldrich,* 945 P.2d at 1375.

Ability to pay is generally calibrated on the basis of actual gross income, unless the facts of the case indicate that the parent is voluntarily unemployed or underemployed. Certainly, at the very least, the statute requires that a parent have the ability to earn a higher income but refuse to do so before income can be imputed to him or her. Indeed, the ALI recommends imputing income that can be potentially earned only when the parent is believed to be concealing income or to be shirking in his or her efforts to earn income:

*Imputation is used when the obligor is believed to be concealing income or to be*

*shirking in his efforts to earn income.* Imputation is troubling when the obligor is charged with obligations that he may not be able to pay, even with the best of efforts. Failure to pay child support may have serious legal consequences for the obligor; thus, the court should exercise caution when considering imputation of earnings to a support obligor suspected of shirking gainful employment.

American Law Institute, Principles of the Law of Family Dissolution: Analysis and Recommendations § 3.14(5) cmt. e(i) (2002) (emphasis added).

When a parent declines to pursue higher paying employment in order to shirk child support obligations, imputing income to the parent serves the goal of requiring parents to support their children to the extent of their reasonable ability to pay. On the other hand, the automatic imputation of income at the level of pay the parent earned before being fired would prevent the court from examining the present circumstances of the parent's incoming earning ability, would not result in like treatment for similarly situated parents, and would not necessarily take into account the best interests of the child. Likewise, a per se rule of income imputation based on termination for misconduct might promote quick settlements, but could clearly result in judicial orders that set child support at unattainable or unrealistic levels for a parent who intends to pay but can never achieve the ordered amount.

We conclude that the General Assembly intended income imputation to be an important exception to the normal rule of computation based on actual gross income of the parent. This exception applies when the parent shirks his or her child support obligation by unreasonably foregoing higher paying employment that he or she could obtain. The legislature meant this exception to prevent detriment to children by deterring parents from making employment choices that do not account for their children's welfare. Nevertheless, the General Assembly intended courts to approach income imputation with caution. Legislative history aids in this construction of the statute.

## D.

### Legislative History

The General Assembly included the income imputation provision when it adopted the child support guidelines in 1986. Ch. 120, sec. 1, § 14–10–115, 1986 Colo. Sess. Laws 718, 718–24. Senator Jeffrey Wells amended the bill to define "underemployment" to state that "a parent shall not be deemed 'underemployed' as long as he is gainfully employed on a full-time basis." *Id.* at 720. Senator Wells explained that the statute would still apply to parents who quit their jobs to "lie on the beach." Hearing on H.B. 1275 before the Conference Comm., 55th Gen. Assemb., 2d Reg. Sess. (April 16, 1986) (statement of Sen. Wells).

Subsequently, the General Assembly wrestled with whether full time employment should be a blanket exemption from income imputation. In 1987, it deleted the full-time employment exemption from income imputation. Ch. 113, sec. 38, § 14–10–115(7)(b)(II), 1987 Colo. Sess. Laws 600. In 1990, it reinstated this exemption. Ch. 113, sec. 9, § 14–10–115(7)(b)(III), 1990 Colo. Sess. Laws 890.

A year later, the General Assembly again deleted the full-time employment exemption, choosing to provide instead that potential income should not be calculated if the parent (1) holds temporary employment reasonably intended to result in higher income in the foreseeable future, or (2) makes a good faith career choice not intended to deprive a child of support and not unreasonably reducing available support. Ch. 38, sec. 1, § 14–10–115(7)(b)(III), 1991 Colo. Sess. Laws 236. The bill's sponsor, Representative Betty Swenson, explained this amendment as closing a loophole in the law that had previously allowed parents to quit a job and take a lower paying job for the purpose of avoiding child support payment. Hearing on H.B. 91–1049 before the House Judiciary Comm., 58th Gen. Assemb., 1st Reg. Sess. (Jan. 15, 1991) (statement of Rep. Swenson).

In 1994, the General Assembly added a third circumstance under which potential income is not calculated, that is, when the parent acts in good faith to pursue education that is reasonably intended to lead to higher income. Ch. 266, sec. 5, § 14–10–115(7)(b)(III)(C), 1994 Colo. Sess. Laws 1538.

The General Assembly's concern about income imputation is realistic. The legislature's persistent focus is upon realistic, adequate child support awards. Its policy is to allow good faith choices that may result in lower paying employment, while preventing parents from shirking a child support obligation. The intent of the income imputation provision, when read as a whole and viewed in the light of legislative history is to impute income when the parent shirks his or her child support obligation by unreasonably foregoing higher paying employment that he or she could obtain. Prior case law is consistent with this construction.

### E.

### Case Law

On several occasions, the court of appeals has examined the income imputation provision. The court of appeals determined that a parent was underemployed when choosing to forego employment under circumstances not involving one of the three statutory exemptions to income imputation. *See, e.g., In re Marriage of Mackey,* 940 P.2d 1112, 1114 (Colo.App.1997)(determining that income should be imputed to mother who significantly reduced her earnings to stay home with the children). The court of appeals determined that income should be imputed to a parent when, upon losing a job, the parent entered another field at a lower paying wage or failed to diligently search for another job. *In re Marriage of Bregar,* 952 P.2d 783, 785–86 (Colo.App.1997) (affirming trial court's finding that father, who was trained as attorney, unreasonably discontinued law practice to start a cattle ranch); *see also In re Marriage of Zisch,* 967 P.2d 199, 203 (Colo.App. 1998) (upholding trial court finding that mother could, with little additional education, be re-certified as a teacher).

In other cases, the court of appeals determined that committing an act which leads to unemployment does not automatically render an individual voluntarily underemployed. *In re Marriage of Hamilton,* 857 P.2d 542 (Colo. App.1993) (ruling that incarceration is just one factor to be considered in determining whether father is voluntarily underemployed); *Atencio,* 47 P.3d at 718 (holding that

a parent is not voluntarily underemployed just because of firing due to drug use).

■ Whether potential income should be imputed to a parent is typically a question of fact; and the factual findings of the trial court are entitled to deference on review, if supported by the record. *See Zisch,* 967 P.2d at 203. A trial court may interpret a parent's lack of initiative in finding or keeping work as a voluntary refusal to fulfill a support obligation. It may consider whether alternative employment is available, but the other parent does not have the burden of proving that a particular job actually exists. *See Bregar,* 952 P.2d at 785.

### F.

### Application to this Case

■ The income imputation inquiry must start with whether the parent is shirking a child support obligation. Is the parent unreasonably foregoing higher paying employment that he or she could obtain? If not, the child support obligation commences with actual gross income. If the parent is shirking a child support obligation, the trial court must determine what the parent can reasonably earn and contribute to the child's support. The trial court must examine all relevant factors. These may include: firing and post-firing conduct; the amount of time the parent spent looking for a job of equal caliber before accepting a lower paying job; whether the parent refused an offer of employment at a higher salary; whether the parent sought a job in the field in which he or she has experience and training; the availability of jobs for a person with the parent's level of education, training, and skills; the prevailing wage rates in the region; the parent's prior employment experience and history; and the parent's history of child support payment.

In this case, Martinez does not contest that he was fired for misconduct, and he could have foreseen that being fired was a possible consequence of his actions. But, when he was fired or asked to resign from both jobs, he had no choice whether to retain those jobs.

We agree with the court of appeals that the trial courts erred when imputing income to Martinez solely because he was fired for misconduct. Martinez briefly sought a job in

Denver but was unable to find one in time to pay rent, so he decided to move to Pueblo, in order to have more support from his family and perhaps to be closer to his children. The trial courts held Martinez to the highest paying Denver job from which he was fired and refused to take into account his search for another job and the reasons for his move to Pueblo. In starting and ending with the firing for misconduct, the trial courts failed to examine all relevant factors.

### III.

Accordingly, we affirm the judgments of the court of appeals and return these cases for further proceedings consistent with this opinion. On remand, the trial courts must examine all relevant factors bearing on whether Martinez is shirking his child support obligations by unreasonably foregoing higher paying employment that he could obtain, and, if he is, the trial courts must determine what Martinez can reasonably earn and contribute to the children's support. If the trial courts do not find that Martinez is shirking his child support obligations by unreasonably foregoing higher paying employment, they should calculate the amount of child support starting from actual gross income only.